Argued September 22; affirmed December 21, 1948

# CONGER v. EUGENE PLYWOOD COMPANY ET AL.

## 200 P. (2d) 936

*Mark V. Weatherford,* of Albany, argued the cause for Appellants. With him on the brief was David B. Evans, of Eugene.

*W. P. Riddlesbarger* and *Windsor Calkins,* of Eugene, argued the cause for Respondents. On the brief for Respondent, Eugene Plywood Company, were Calkins & Calkins, of Eugene. On the brief for Respondent, Giustina Bros. Lumber Company, were Harris, Bryson, Riddlesbarger & Butler, of Eugene.

Before Rossman, Chief Justice, and Lusk, Belt, Bailey and Hay, Justices.

LUSK, J.

Plaintiffs Benjamin F. Conger and Iva B. Conger, husband and wife, are the owners of a tract of land 127.67 acres in area in Lane County, Oregon. They charge that portions of their land comprising 78.9 acres have been inundated and rendered valueless by water negligently permitted to escape from log ponds built and maintained by the defendants Eugene Plywood Company, a corporation, and Erminio Giustina and others, a co-partnership doing business as Giustina Bros. Lumber Company, to the damage of plaintiffs in the sum of $157,800.00. This action was brought to recover such damages.

The case was tried to a jury, but at the conclusion of the testimony each of the parties moved for a directed verdict, whereupon the jury was discharged and the court took the case under advisement.

Thereafter the companion case of H. L. Edmunson and Minnie F. Edmunson, against the same de-

fendants for the same delict, involving alleged damage to land adjoining that of the Congers on the west, was tried to the court without a jury under a stipulation that "the evidence taken in the Conger case so far as applicable will apply in this (the Edmunson) case" and that the two cases should be decided together. It has further been stipulated in this court that the evidence taken in the Edmunson case so far as applicable will apply in the Conger case.

The court in due course rendered its decision and filed findings of fact and conclusions of law favorable to the defendants in both cases, and entered judgments accordingly. Plaintiffs Conger have appealed from the adverse judgment in the instant case.

The Circuit Court's findings of fact and conclusions of law (omitting those findings which merely identify the parties and describe plaintiffs' land) are as follows:

"V.

"That in the year 1940 the Eugene Plywood Company commenced the construction of a twenty-three acre log pond upon its property at approximately Second Avenue West and Garfield Street in the city of Eugene, and employed an engineering company to test the soil and to prepare plans and specifications and to superintend the construction of the floor and dikes of the pond and to superintend its construction. That a foreman was placed in charge and the construction proceeded to completion under the constant supervision of the engineering company and according to the best standards of practice in the state of Oregon. That when completed the pond was carefully tested and filled with water and during the first year after its completion sealed itself in such a manner as to make it impervious to percolation or leakage.

"That thereafter and from that time forward until the commencement of this action the Eugene Plywood Company maintained constant supervision, inspection and oversight over the dikes, and installed equipment for dumping logs into the pond in such a manner that no injury occurred to the walls or bottom of the pond during the operation, and the Court finds that the pond was constructed and maintained in such a manner that no leakage or seepage occurred from it, and that no water impounded in the pond has reached the lands of the plaintiffs.

"VI

"That the defendants Giustina in the year 1941 commenced and completed a six acre log pond abutting on Second Avenue West immediately east of the Eugene Plywood Company log pond, which pond was constructed after soil tests with the aid and under the supervision of the Oregon State College Engineering Department, under plans and the supervision of competent engineers and according to the best practice for the construction of log ponds in Oregon, and said log pond, during the first year after its completion, became completely sealed and water tight so that no water escaped therefrom, either by leakage, seepage, percolation or otherwise.

"That the defendants Giustina maintained constant supervision and oversight over said log pond and dikes from the time of its completion until the commencement of this action, and none of the impounded water escaped from said pond and none of it ever reached the lands of the plaintiffs. That equipment was installed for dumping logs into the pond in such a manner that no injury occurred to the walls or bottom of the pond during the operation.

"VII.

"That both log ponds obtained water during the summer season by means of a conduit and pump

from the Willamette River, but during the winter season no water was pumped and any water overflowing from the ponds during the winter season was the result of ordinary rainfall and flood conditions which were not affected by the presence of the log ponds of the defendants. That no overflow occurred during the summer seasons.

"VIII.

"That for a period of more than forty years drainage from the city of Eugene has proceeded westerly through ancient channels over, upon and across the lands of the plaintiffs and during that period, due to the construction of three railroad lines and a through state highway, that the drainage from the northern portion of the city has converged at what is known as the Highway overhead on Highway No. 99 North, and flowed through two small ornamental lakes constructed by the State Highway Department on the east side of Highway No. 99, thence under the Highway and through another small ornamental lake constructed by the Highway Department, and thence down through an ancient waterway across the lands of the plaintiffs, and that any water crossing the lands of the plaintiffs is the result of innumerable sources of drainage entering waterways which have passed over plaintiffs' lands for half a century, and that the impounded water in defendants' ponds has not contributed to the waters flowing across plaintiffs' lands.

"IX.

"That the Court finds, generally and specifically that any water reaching the lands of the plaintiffs hereinbefore described, is the result of long continued conditions through ancient waterways and is due to some extent to the growth of the city of Eugene and surrounding territory and is not attributable in any respect to the log ponds of the defendants.

"Based upon the foregoing Findings of Fact, the Court makes the following

## "CONCLUSIONS OF LAW

"That the plaintiffs have failed to sustain the allegations of their complaint by a preponderance of the evidence, and the defendants are entitled to judgment for their costs and disbursements herein."

Plaintiffs assign as error the making and entering of each of the foregoing findings of fact and conclusions of law, and the failure of the court to adopt certain findings of fact and conclusions of law submitted by the plaintiffs which follow generally the allegations of the amended complaint on which the case was tried. In substance, the requested findings are to the effect that the defendants' log ponds were negligently constructed of porous soil at an elevation above that of plaintiffs' land and at a distance of about one-half mile therefrom; and that the waters impounded by the defendants have escaped through the floors and walls of the ponds by seepage and percolation and have flowed through natural drainage waterways to the plaintiffs' land, and likewise have reached such land by percolation through the soil; and that as a consequence portions of plaintiffs' land are permeated with such water and have been caused to become a marsh and permanently damaged.

■■ Since each of the parties moved for a directed verdict, the only question for this court under these assignments of error is whether there is substantial evidence to support the Circuit Court's findings. If the evidence is conflicting on material issues then the findings of the trial judge are conclusive here. *Munly v. Jones,* 130 Or. 252, 255, 279 P. 630; *Port of Nehalem*

*v. Nicholson*, 122 Or. 523, 525, 259 P. 900; *Jaloff v. United Auto Indemnity Exchange*, 120 Or. 381, 394, 250 P. 717; *Hudelson v. Sanders-Swafford Co.*, 111 Or. 600, 607, 227 P. 310; *First National Bank v. Bach*, 98 Or. 332, 335, 193 P. 1041. It may be conceded that undisputed evidence shows that year-round water from some source has, since the building of defendants' ponds, reached the plaintiffs' land and damaged it. But, unless it is shown without contradiction that these waters came from the ponds, this court has no authority to disturb the trial court's findings on that question. Substantial conflict in the evidence must necessarily result in affirmance of the judgment.

We proceed to a consideration of the evidence:

Plaintiffs' land is a rectangular tract 3,960 feet in length and 1,404 feet in width, the east boundary (3,960 feet) lying something over one-half mile west of the westernmost city limits of the city of Eugene. Plaintiff Benjamin F. Conger inherited the land from his father, and it is not disputed that it was all tillable land up to the time of the building of the ponds. Water from the winter rains did not remain on the land through the spring and summer but drained off through natural depressions and furrows ploughed at the end of the farming season in the autumn. The plaintiffs do not complain, however, that any serious damage was done to the land by water coming upon it until a considerable length of time after the second pond, that of the defendants Giustina Bros., was built in 1941. The amended complaint, filed April 23, 1946, alleged:

> "That said negligent acts of the defendants caused said water to flow in the general direction of plaintiffs' land and to saturate the entire area between plaintiffs' land and the said mills and

within the last two years to reach, saturate, and permanently damage and destroy the said 78.9 acres of land owned by plaintiffs and hereinabove described.''

H. L. Edmunson, plaintiff in the companion case whose land adjoins Congers' to the west, testified, in response to the question whether in 1944 or 1945 there was any change in the Conger land: ''Well, in the condition of the land it was changing all the time from bad to worse'', but that it was not until 1944 that he made any complaint to the defendants about water coming on his lands. The Conger land apparently was farmed during 1943, but there is evidence that water had at that time begun to stand on it during the summer and that cattails had begun to grow thereon. By 1946, according to witnesses for the plaintiffs, the damaged areas had become ''a swamp''; ''the water had permeated all through it''; it was ''full of cattails and before it could ever be of any use it would have to be filled or possibly drained''.

The Plywood property is located approximately one-half mile east of the northern portion of plaintiffs' land. Its log pond was built in the summer of 1940. The pond is irregular in shape and has an area of about twenty-three acres. Its extreme easterly dike or wall abuts on Garfield Street, which runs north and south. Guistina Bros.' plant is across Garfield Street immediately to the east of the Plywood pond. The property is bounded on the west by Garfield Street and on the south by Second Street, which runs east and west. The Giustinas' pond, built in 1941, is about eight acres in area. Neither plant is within the corporate limits of the city of Eugene.

Plaintiffs' land is comparatively level. It is at an

elevation of 395 feet, whereas the elevation at the site of the two ponds is 405 feet or more. There is no dispute about these facts, nor about the further fact that natural drainage from the vicinity of the two plants is toward the west and northwest and would and does reach plaintiffs' land.

Between the Plywood plant and plaintiffs' land are the Oregon Electric Railroad and Highway 99, which parallel each other as they come from a northwesterly direction toward Eugene. The railroad parallels the southwesterly side of the Plywood pond at a distance of between 100 and 200 feet therefrom, and the highway lies about 400 feet farther towards the southwest from the railroad.

As the railroad and the highway approach the city they curve to the left and east, approximately as they reach a line due south of the west dike of the Plywood pond; and about where the curve commences the highway divides and forms a Y, the southerly branch becoming Seventh Street and the northerly Sixth Street as they enter the city. The south dike, as we shall call it, of the Plywood pond actually runs from the southern end of the west dike in a southeasterly direction, following roughly the bend of the railroad and the highway. Farther to the north the highway is built up as an overhead crossing, on either side of which is a small pond, the one to the east (between the highway and the Oregon Electric) being referred to in the testimony as the "east borrow pit" and the one to the west as the "west borrow pit", so-called from the fact that at the site of these ponds earth was excavated or "borrowed" by the State Highway Commission for use in construction of the overhead crossing. The borrow pits lie west and slightly north of the

Plywood pond and east and a little north of the north line of plaintiffs' land. The overhead crossing was constructed before the Plywood pond was built, and the evidence is that the east pit was filled with water before the Plywood pond was built. The borrow pits and a thirty-inch concrete pipe or culvert connecting them figure prominently in the testimony. There is another such borrow pit on the east side of the highway and a little north of the east borrow pit just referred to and connected with it. Between them runs the line of the Coos Bay branch of the Southern Pacific Railroad, which continues east past the two log ponds and quite close to the north border of the Giustina plant. The borrow pits are the "small ornamental lakes" referred to in Finding VIII, supra.

The evidence shows the existence of several ancient drainways, which pass around and in the vicinity of the two log ponds, converge and terminate at the east borrow pit, from which water flows under the highway through the thirty-inch culvert above mentioned, empties into a small lake or basin between the highway and the west borrow pit, and then into the west borrow pit, and from there into a drainage ditch which enters plaintiffs' land near its northeast corner. The defendants' witness W. C. Clubb, city engineer of Eugene, testified that this water flows through an 8 x 8 inch wood culvert into the west borrow pit; that he measured the flow at this culvert in June, 1946, and computed it to be 45/100 cubic feet per second. Mr. Clubb observed these conditions on numerous occasions at different seasons of the year, and testified that the flow was constant, there being no appreciable difference in the quantity of water in the summer or fall and at other times of the year. This water is one of

the principal sources of damage to plaintiffs' land, as its origin is one of the hotly contested issues in the case. Plaintiffs assert that it comes from defendants' log ponds, and we will now, therefore, consider further the evidence upon which they rely to support this claim.

It will be necessary first to examine in more detail the location and courses of the various drainways in the vicinity of the log ponds.

We will begin at the Giustina property, the eastern-most of the properties involved. On the east end of the Giustina pond is a log dump. The sawmill is north of the pond, the planing mill northwest, and in the southwest corner of the property is the office. A map in evidence (Defendants' Exhibit 7) indicates that the tracks of the Southern Pacific Railroad are approximately 400 feet north of the Giustina pond, the sawmill and planing mill thus being between the pond and the railroad tracks. One drainage ditch originates east of the Giustina Bros.' property, passes through the northern part thereof, crosses Garfield Street and continues past the Plywood pond on the north side of a spur track of the Oregon Electric Railroad, first in a southwesterly and then in a northwesterly direction, goes under the Oregon Electric track and into the east borrow pit.

Another drainway formerly ran through the site of the Giustina pond from east to west. After that pond was built drainage waters flowing westward from the city of Eugene were obstructed by the eastern dike of the pond, so that it became necessary to dig a ditch along that side south to an existing ditch on the south side of Second Street (Second Street, it will be recalled, is an east-west street which runs along the south side of the Giustina property). The ditch last referred to

proceeds westerly to Garfield Street, which, as above stated, is between the Plywood and Giustina properties, thence northerly along Garfield Street and at the base of the east dike of the Plywood pond until it joins the north drainway, above described, at a point a short distance northeast of the Plywood pond.

A third natural drainway is accurately described in the brief of the defendants Giustina as follows:

"A third natural drainway originates southeast of the Plywood plant, passes through the sites of industrial establishments including two sawmills and a shingle mill, thence literally through the Plywood plant, thence along the base of the south dike of the Plywood pond and between it and the Oregon Electric track (i. e., the main track), thence along that track for a considerable distance until it enters a culvert passing under that track, thence to the above mentioned borrow pit."

Although the plaintiffs' brief speaks of "eye witnesses who have observed this water oozing from each of these ponds" no testimony of any such witness has been quoted, nor have we been referred to any place in the transcript where it can be found. Close study of the testimony has failed to uncover evidence of that character. There is, it is true, testimony, coming from the defendants themselves, of leaks discovered and quickly stopped in both ponds shortly after they were built. There is also evidence about water that leaves the Plywood pond through an overflow pipe, but only during the winter months. Of these matters we shall have occasion to speak again. Essentially, this is a circumstantial evidence case. The plaintiffs perforce must rely on deductions from observed facts to establish their claim. We turn to the testimony to which plaintiffs direct our attention in their briefs.

Plaintiff Benjamin F. Conger testified as follows concerning conditions at the base of the south dike of the Plywood pond:

"Q Now, have you during the summer and during the dry fall walked from the track there across up the side of the dike?

"A Yes, sir.

"Q What was the situation there around alongside the railroad track and at the base of that wall?

"A Well, I recall it, I went up there one time and I had to jump across the water and then climbed up that bank here and went down there. The water seems to follow right along that borrow pit of the railroad. There is a culvert under that road that you speak of and it goes right on down, and then there is a culvert underneath the Oregon Electric, and then it goes on down in that lake down there.

"Q But in the summer time as well as now what was the situation there with reference to water on the outside, the base of that dike?

"A I have never been there in the summer time but what there was water down there.

"Q How wide across there? That is, was there water that if you would step in it it would go up over your shoe tops in places?

"A Yes, I believe it would.

"Q And in other places how deep would it be?

"A Well, I believe it would be two or three feet deep in lots of places.

"Q And between there and the wall, would it be shallower? I mean the base of the dike?

"A Well, just like any other ditch. It would go down this way and up to the base, to the wall.

"Q I mean between where the main water was and all, was it sloppy and be mud and muck?

"A I have never noticed around there but what it was mucky around the base of that dike."

Mr. Conger was next questioned about the Giustina pond and testified as follows:

"Q Now, did you ever notice around the east base—or the west side of that wall, or on the south side?

"A Well, do you mean the seepage?

"Q Yes.

"A Yes, there is a stream of water running there on the south side. It is over on the south side on Second street, and then is carried up to the Plywood, and goes around the Plywood and on down through there, and at the north I have always observed there is a lot of docks and there is lots of water coming out on that.

"Q These are situated along the pond?

"A These docks?

"Q Yes.

"A The pond seems to end in a very near north and south line and then those docks and sawmills come in there, and the water comes out from under these docks. I have never crawled under there to see whether the water comes from any other source than that, but I have observed when the sawmill wasn't running that the water was running just the same, so it comes from somewhere.

"Q You have been clear around the mill? There is no water coming over east of there, was there?

"A No, sir. No, sir, I would go east on Second street and as soon as I left the Giustina pond it would be apparently dry."

The witness Conger then proceeded to trace the course of the waters from Second Street and from the north drainage ditch to the east borrow pit. He testified that the stream measures twenty-eight feet in width as it goes under the railroad before entering the pit and two feet in depth; that he had observed it almost every month of the year and there was no substantial

difference in its size in August and October, but there would be more water in it in December after the rains set in; and that the concrete pipe connecting the east and west borrow pits was full of water every time that he had seen it.

Referring to Conger's testimony above quoted, that as soon as he left the Giustina pond and went east on Second Street "it would be apparently dry", counsel for plaintiffs argue:

> "This shows that the source of the stream of water that he described during the summer time and when it is dry does not go east beyond the Giustina pond and that this stream is filled with waters seeping from the Giustina pond and the Plywood company's pond."

The testimony of H. L. Edmunson, plaintiff in the companion case, upon the foregoing matters, is substantially to the same effect as Conger's. He testified that every time he was at the two plants "there was water around them", although he had never been "around the Giustina plant altogether", but he had been on the street between the two plants (that is, Garfield Street). Apparently he had never observed the east side of the Giustina plant. He testified that the county had dug the ditch north of the Oregon Electric spur track, and that water from the Giustina plant at the north flowed through a culvert in Garfield Street into this ditch, and thence into the east borrow pit.

Plaintiffs' counsel next refer in their brief to another course by which it is claimed water from the defendants' ponds finds its way to the plaintiffs' land. The testimony shows that, in addition to the land in controversy, plaintiffs own a small tract abutting on

the southwesterly side of Highway 99 and southwest of the Plywood pond. Near the southern end of this tract there is a restaurant belonging to the plaintiffs, and a short distance south of the restaurant are two concrete culverts, side by side, under the highway. Water running through these culverts flows into a ditch, referred to by counsel for defendants as the State Highway Ditch, which proceeds in a westerly direction until it enters plaintiffs' land at a point about midway between its north and south borders. This water is said to originate in the ditch at the base of the south dike of the Plywood pond and to cross under the Oregon Electric tracks and over the intervening ground to the concrete culverts last mentioned.

There is also reference to alleged admissions that the Plywood pond leaked, made by Leonard Nystrom, president of the Plywood Company, which will be discussed later.

It is claimed by the plaintiffs that the proof shows without contradiction that water from the defendants' ponds, percolating through the floors and walls thereof and running through the open ditches above described, has permeated the soil on either side of the ditches, spreading from year to year, and has produced a new and higher water table in the area to the west of the ponds, including plaintiffs' lands. It is asserted that at the time the ponds were built the water table, meaning thereby "the upper limit of the portion of the ground wholly saturated with water", Webster's New International Dictionary (see *Beaver Creek Lumber Co. v. Risse*, 123 Wash. 525, 212 P. 1057), was twenty feet below the surface, whereas today it is practically at the surface. It is further claimed that "the percolating water goes underground from the base of the

ponds through percolating underground sources and reaches the lands of the plaintiffs and saturates them the same as the permeating waters and the percolating waters from the ditches.''

In support of this theory, attention is called to the testimony of O. C. Yocum, the engineer who built the Plywood pond. He testified that about the time construction was commenced in the summer of 1940 they found an old well on the property with water in it; that they excavated to a depth of thirty feet and enlarged the opening in the hope of getting a considerable quantity of water for use in the pond. But the soil was heavy clay with some gravel in it, and they discovered they would have to go too far down to get free-flowing water in any quantity. It was a small well, about eighteen or twenty feet deep, sufficient for a one-family dwelling. They pumped it dry, and the water came up four feet in twenty-four hours. Conger testified that he observed this work of excavation and that the walls of the pit ''were dry, and I noticed particularly the different strata of gravel and so forth down in there.'' This pit or ''sump'', as it is called by some of the witnesses, has remained open and at all seasons of the year has water in it to a depth of seven or eight feet.

The next item of evidence relied upon to support the saturation theory relates to the amount of water in the east borrow pit at the time the Plywood pond was under construction. Yocum obtained permission to pump water from the pit into the pond for the purpose of testing it. He put in a pump, and, as he testified, ''pumped them down pretty low (i. e., the east borrow pit water), and at that time we found out that they were not filling up fast enough to do us

any good and we gave up that idea and started installing our pump line to the river." He testified that "there was lots of water in the borrow pit" at that time. He did not testify, as plaintiffs' brief asserts, that the borrow pit "ran dry", but that "We never did pump it dry" and "We saw that it wasn't going to fill up fast enough to do any good in time to fill that twenty-five acres log pond."

Attention is next called to the following testimony of the defendants' witness Clubb. He was employed by the defendant Plywood Company to conduct an experiment for the purpose of determining if possible whether water was leaking from the ponds. He drilled a test hole in the ground near the restaurant above mentioned, about 600 feet southwest of the Plywood pond and toward plaintiffs' land, and made observations each week from March 30, 1946, until August 17 of that year to determine the level of the water beneath the surface. When the hole was dug in March he struck water at an elevation of 401.10, which was 45/100 of a foot underground. By August 17 the water had lowered to an elevation of 396.15, a difference of about five and one-half feet. The argument of the plaintiffs in this connection is that there was no water in that area above a depth of twenty feet before the ponds were built; that Clubb's testimony shows that during the summertime there was water within five feet of the top of the ground and about six feet above the elevation of the land of plaintiffs, and that it follows that the ground was filled with water and that the only source of that water was the defendants' ponds. The basis for the statement that there was no water in the area above a depth of twenty feet at the time the ponds were built is the testimony concerning the

well on the Plywood property to which we have already referred.

Finally, plaintiffs rely on the testimony of another witness for the defendants, Erick Tangfeldt. Mr. Tangfeldt operates a lumber mill, which is located about eighty feet southwest of the Plywood pond and across the Oregon Electric track. In connection with his mill he has a log pond. He did not testify to the size of it, but a map in evidence (Plaintiffs' Exhibit B) indicates that it is not more than one-sixth the size of the Giustina pond. Tangfeldt had operated this mill since December, 1944. He was called by the defendants to testify on another matter to be mentioned later. On cross-examination he testified that he got the water for his pond from two twenty-foot wells. He was asked: "Q Do you have to pump all the time to keep that full of water?" and answered: "In the summer time pump all the time. In the winter time it is limited." This line of inquiry was not pursued. Again, it is argued that this evidence shows that water was moving from the Plywood pond under the ground by permeation and percolation. Plaintiffs' brief says:

> "Before the construction of the pond there was no substantial water in that area at a twenty-foot depth; some time after filling this twenty-three acre pond with water, there is an abundance of water, an inexhaustible supply for two wells in the same vicinity."

We turn now to evidence which, in addition to some of that already discussed, in the defendants' view supports the findings of the Circuit Court.

The court found that the Plywood pond "sealed itself in such a manner as to make it impervious to percolation or leakage", and that the Giustina pond

"during the first year after its completion, became completely sealed and water tight so that no water escaped therefrom". There is ample evidence to support these findings. We have mentioned above the leaks that occurred in each of the ponds shortly after they were built. The testimony on behalf of the defendants shows that the leakage in the Plywood pond was due to the fact that a steel drain tile, imbedded deep in the ground, was overlooked when they were building the pond and that leakage through this drain commenced after the dike was filled with water. A coffer dam was built around the drain, which was then pumped dry and the leak was sealed off, and there has been no trouble from it since. Nat Giustina, a partner in Giustina Bros., testified concerning their pond:

> "At the very first we had a small leak, I guess you would call it a leak or seepage, on the east side of the pond. We watched it and it kept getting smaller all the time and then it finally disappeared and has been since about six months after the building of the pond, it has completely disappeared."

That was the only instance of the escape of water from the Giustina pond within the witness' knowledge.

There is abundant evidence that the ponds were properly built. We think it unnecessary to recite this evidence in detail. The only material used in the construction of these ponds was the dirt and soil at their site. Notwithstanding the argument of plaintiffs to the effect that the use of such material for impounding water constitutes negligence and that ponds so constructed cannot be impervious to water, the fact remains that the defendants' evidence creates a decided conflict on this question. O. C. Yocum, the engineer who built the Plywood pond, has had extensive experience in that kind of work in the Willamette Valley and

southern and eastern Oregon. He testified in substance that the soil was tested and found to be suitable material for a dike and pond; it was a heavy clay material, of a thickness of three or four feet at the base of the pond. He described in detail the method employed and the care used in compacting the soil, so that, as he said, "it was very well compacted". His lengthy testimony constitutes substantial evidence that the pond was properly constructed, and would justify the conclusion that a pond so constructed would seal itself and that the Plywood pond did seal itself long before 1944 when the plaintiffs claim that serious damage to their land first began to manifest itself. We quote from his testimony:

"Q I want to question you generally in regard to the action of water in any pond or any ditch or anything that holds water by dirt alone? Calling your attention, for instance, to the city water ditch, to any ponds that they make, to this or to any pond. What is the fact as to whether the liability to seepage progresses or becomes greater or whether it becomes relatively less as the pond is used as to keeping in water?

"A Well, unless there is some other causes to interfere why your troubles are over after your first year. Now, I am speaking entirely on the dike and the water involved inside. If you have some other cause working on the dike from the outside it could occur any time. So far as sealing off the first few months is the critical period for any dike."

\* \* \*

"Q What is the natural effect of great quantities of dirt such as there is on those dike walls compacting itself as time goes on? That is to say, after you have compacted it as hard as you can what would you say as to whether it settles and becomes more compact with the passage of time?

"A That's the general tendency. However, one

packed in as hard as these, I doubt if there would be a great deal. I don't think it could be a great deal. It would have a tendency to do that, and the more lightly compacted when constructed the more that would be noticeable.

"Q Now, the testimony of the plaintiff is for the first four years they had no trouble but subsequently they did. That is, they claimed leakage after the first four years, and I want to ask you what the general rule would be as to whether that pond and the walls would become more solidified and more sealed as they were used?

"A That right. It would."

Nystrom testified that his company built a pond at Willamina in 1939, another at the same place in 1943, and a third in Roseburg in 1944; that all were built from the "native dirt"; and that while there was leakage at first all these ponds sealed themselves.

We are not now dealing with the issue of negligence as such. But where it is shown that a pond, if properly built, will not leak—at least after the first few months—, the fact that it was properly built is relevant on the question whether there has been leakage.

Further evidence on the tendency of such ponds to seal themselves is that given by Nat Giustina already referred to. Giustina had an engineering course at Oregon State College and assisted his uncle, George Giustina, who was not living at the time of the trial, in the work of building the pond. He gave testimony which would justify the conclusion that there was no want of care in that work.

Clubb, city engineer of Eugene, testified as an expert that the earth in the dikes of ponds built as these were "settles". He further testified:

"Q So would you say in regard to any pond and particularly in regard to this pond here that if

that was built in 1940, would you say the probability of leakage grew progressively less or progressively greater? * * *

"A I believe if it stood during that period it should be better at the end than it was at the beginning."

B. S. Cole, who has had experience in the lumber business over a period of twenty-five years, including the operation of mills where log ponds are used, testified on the same subject as follows:

"Q Mr. Cole, let me ask you another question: In all your experience in the logging and lumbering business have you owned or had anything to do with anything but dirt dams?

"A No. All of our dikes or our ponds were dams of dirt.

"Q Did you ever know of anything but a dirt dam in the logging industry here in Oregon or Arkansas?

"A No, I haven't.

* * *

"Q Have you at this time a dirt pond over at Springfield?

"A Yes, we do. The pond was built there on flat land or level land and the dirt is moved out with a bulldozer and dikes were built around and the pond was constructed.

"Q In much the same way that we are going to claim that this pond was built here?

"A That's correct.

"Q What I want to ask you is what is the general experience in regard to the seepage and leakage, as to whether it gets progressively worse, or whether it becomes progressively immune to leakage?

"A It has been our experience that the worst leaks is after the pond is newly built, until it settles down and runs together, especially there may be

some trash or debris and dirt on the ground and that rots and settles down. In our pond over there we had some trouble with leakage to begin with. The county court or those who have to do with county roads got after us about some leaks from the pond, but that has all been done away with now."

We take up now the testimony relating to water in the vicinity of the Giustina pond. We have already referred to the testimony of Nat Giustina that water coming from the east was obstructed by the east dike of the pond and diverted to Second Street by the digging of a ditch for that purpose. Conger, it will be recalled, testified that he had seen water coming in a westerly direction from under the docks north of the Giustina pond. During the trial (which took place in December, 1946) he examined the dock area and testified that he then observed that water coming from the direction of the docks flowed in a ditch westward and through a culvert in Garfield Street. He did not go under the docks, but testified that "the entire stream was coming from that direction." On cross-examination he testified:

"Q Now, did you follow along the north dike of the Giustina pond and look down at the base of that dike, if you could see it under the edge of the dock? Did you do that?
"A Yes.
\* \* \*
"Q Did you see water standing there?
"A No, I didn't, but it looks damp."

He did not cross the dock to the easterly side to see whether there was water on that side.

It may be observed that the base of the dike could be damp in the month of December, when rain in the

Willamette Valley is the order of the day, without compelling the conclusion that the dampness was caused by leakage of pond water through the dike. But, beyond this, the testimony of Anselmo Giustina, one of the Giustina Bros. partners, is that the original mill was located northwest of the log pond on the site of the present mill; that in 1934 water was standing upon the premises and water was flowing through the ditch south of the planing mill, over the northern part of their property, across Garfield Street and thence westerly along the Oregon Electric spur track; and Nat Giustina testified that the docks, which were built in the summer before and during the time that the pond was being built, "were put on piling because it was in a swamp." Nat Giustina also testified to the existence of this water flowing from the east across the northern part of their property before the pond was built. He further swore that he had never seen evidence of seepage or dampness around the base of their pond on any side. The western terminus of First Street is at the northeast corner of the Giustina pond, and Clubb testified that "an awful lot of water comes down First Street * * * We take as much as we can in our sewer system, but it is too small for storms."

Regarding the ditch which runs between the south dike of the Plywood pond and the Oregon Electric, Clubb testified that on December 3, 1946, he was at the culvert under the Oregon Electric track through which water in this ditch flows on its way to the east borrow pit, and he doubted whether there was an inch and a half of water there at that time.

After the filing of the amended complaint on April 23, 1946, the Plywood Company caused an automatic pump to be installed in the ditch on the north side of

its pond and another such pump in a ditch at the base of the east dike for the purpose of ascertaining whether the waters that flow in these ditches reach plaintiffs' land. It is the claim of the plaintiffs, it will be recalled, that waters flowing out of the east borrow pit under the overhead into the west pit and thence to their land have their origin, in part at least, in waters flowing around the east and north sides of the Plywood pond in the ditches where these pumps are placed. Clubb testified that after the pumps were installed and the water was pumped out of the ditches he observed from time to time the flow of water into the 8 x 8 inch wood culvert at the west borrow pit, and could see no difference in the volume. This evidence would have a tendency to show that, independently of water coming from the vicinity of the Plywood pond, water flowed from the west borrow pit onto plaintiffs' land, and that water in the ditches at the base of the pond do not reach that land.

To rebut the claim of the plaintiffs that water from the Plywood property flows to the state highway ditch defendants called the witness, Erick Tangfeldt. He testified that on December 3, 1946, he examined the area between the Plywood pond and the highway ditch; that a culvert about eighty feet long leading from the vicinity of the Plywood Company's office empties into the two culverts which cross the highway in the neighborhood of Conger's restaurant; that at the time of his examination there was no water in the Plywood Company's culvert; that it was "just a little damp" and "there is no water coming out of the culvert coming from behind the Eugene Lumber Company's office, and the two culverts going across the road is just about half full and the water seems to be

standing still there for at least twenty feet." In addition to the foregoing, there is evidence that the highway ditch is fed by waters that flow from the east in ditches along Sixth and Seventh Streets and which have no possible connection with defendants' log ponds.

We have referred to alleged admissions as a witness by Mr. Nystrom. On direct-examination he had testified to the Plywood Company's vigilant inspection of the pond for the purpose of detecting possible leaks. On cross-examination he testified as follows:

"Q As I understand it, over what period did you say that you had to exercise extraordinary care with respect to leaks?

"A Well, so far as leaks, we at no time have had very much leak in that pond but for the first year until the grass grows over the bank and the water didn't wash the bank itself out."

The answer is somewhat ambiguous. It could certainly be interpreted, however, as meaning that there were no leaks after the first year, and it is possible that the witness was referring to the leak through the old drain tile shortly after the pond was finished and which was sealed off. The trial judge would have been warranted in adopting either or both such interpretations.

The evidence shows that to get water to fill its pond the Plywood Company built a main to the Willamette River, a mile to the east; that in the summer a certain amount of water is lost through evaporation and some water is soaked up by logs in the pond, and that to keep the pond filled to a proper level water is pumped from the river. Nystrom testified that they pumped about two days a month in the summertime.

On cross-examination he was asked, in connection with this loss of water, whether there might be "a little seepage there and a little percolation out of that involved" and answered "I wouldn't say." On redirect he explained this answer by testifying that "as far as I know to my knowledge I have not seen any leakage out of the pond." His testimony proceeded:

"Q Well, so far as you know you have never seen any leakage from that pond except the one time that has been disclosed in the testimony?

"A Correct.

"Q And what you meant was that if there was seepage you didn't know about it, but you wouldn't guarantee that there was?

"A I haven't seen any."

The "one time that has been disclosed in the testimony" obviously was a reference to the leakage through the old drain tile. The effect to be given to the foregoing testimony was for the trier of the facts. It is probable that no person could *know* whether the pond leaked or not, and an honest witness might well hesitate to go further than to say that there was no leakage to his knowledge. If the trial judge thought, as well he might, that this was the meaning which Nystrom intended to convey, this court is not authorized to say that he was wrong.

No inference unfavorable to the defendants is necessarily to be drawn from the testimony about the amount of water in the so-called sump pit, the excavation at the site of the well found on the Plywood property when construction of the pond was commenced. Evidence on behalf of the defendants shows the source of this water. Mr. Nystrom was asked to explain the operation of an overflow pipe at the south dike of the

Plywood pond and about 300 feet east of the sump pit. We quote from his testimony:

"Q Now, I want to get at the operation there. During the summer months is there ever any overflow through that overflow pipe?

"A There is no overflow in the summer months, in the dry months, there is no overflow into the overflow pipe.

"Q Then what happens in the winter time?

"A In the winter time we get—when the surface water, when the rain water starts, we have a big hole there in the ground, and all this water coming in from—whether it comes from the east of the plant, east of the plant is two sawmills and one shingle mill, and all that territory, the surface water runs to the plant and it goes right by our office, underneath our plant, but it drains into this big hole, that big sump hole, and we got two pumps installed at that. One is 400 gallons a minute, and the other is 125, and when we have surface water, when we have rain water those pumps are going all the time and that water has to go up through the overflow. Otherwise it would come up over the dike and start to flow over the dike. So that's why we have the overflow pipe."

On cross-examination Nystrom testified that it was not correct to say that water was pumped out of the sump pit all the time, but only when the water reaches a certain level. Then the pump starts, and when the water goes down the pump shuts off. He testified that there is water in the sump pit during the summer, but that the pond had no effect on the sump pit.

"Q It (the sump pit) is pretty full all the time now?

"A It gets filled with water and we also have two turbines in our plant and a turbine takes a lot of water to cool off. You have a steady flow of water. No, that is not correct. That water is not

returned into that. It is returned back into the pond, but we have our grate water, you know, of grates in a boiler, and that water is taken out of the pond, going through the grates and going into this sump and pumping back into the pond.

"Q Is there any water in that sump in the summer time?

"A It is continuous. This water here is circulating all the time."

The water that comes out of the pond through the overflow goes into the culvert under the Oregon Electric. This occurs only during the rainy season, and, as Yocum testified, there is "no true pond water that overflows from the pond".

We proceed to a consideration of the claim of a new water table, brought about, as the plaintiffs assert, by seepage through the floors of the ponds, percolation through the ground, and permeation and saturation of the soil.

We think that a legitimate inference might be drawn in favor of plaintiffs' theory from the fact that the water level at the test hole dug by the witness Clubb was only five and one-half or six feet below the level of the ground in the dry season of the year. We think likewise that the opposite inference is permissible, namely, that, if the ground in the vicinity of the Plywood pond was saturated with water seeping through the floor of the pond, the level of the water at the test hole would not be affected by the season of the year since, by hypothesis, such saturation was produced by a cause which operated continuously through the year and in all seasons. It was for the trial judge to say which of the two inferences was the more reasonable. So, likewise, as to Tangfeldt's two twenty-foot wells from which he pumped water into

his pond. The plaintiffs' argument here, as set forth in their brief, is as follows:

"* * * Before the construction of the pond there was no substantial water in that area at a twenty-foot depth; some time after filling this twenty-three-acre pond with water, there is an abundance of water, an inexhaustible supply for two wells in the same vicinity. Where does this water come from? Does the pond leak? Is water moving from the pond under the ground by permeation and percolation?"

Possibly a jury would answer these questions in the affirmative. Evidently the trial judge, sitting as a jury, answered them in the negative. We think he was warranted in doing so. Certainly it cannot be said as a matter of law that, because the Plywood Company could not get enough water to serve the purposes of its twenty-three acre pond from the well on its property, there was not sufficient water in the area at a twenty-foot depth, before the Plywood pond was built, to supply the needs of a pond like Tangfeldt's, the area of which is probably less than one-twentieth that of the Plywood pond. As to Tangfeldt's answer, "In the summer time pump all the time. In the winter time it is limited.", it may be, as counsel for plaintiffs suggest, that this denotes "an inexhaustible supply" of water, but it may be also, as counsel for defendants say, that the consistent pumping in the summertime denotes a lack of water rather than an abundance of it. At best, the statement of the witness is cryptic and conclusive of nothing.

There is other evidence that conflicts with the saturation theory. It is shown that in all this area, from the site of the log ponds west to plaintiffs' land the soil, approximately two feet underneath the sur-

face, is an impervious clay to a depth of from three and one-half to four feet. It could be found that, as stated in the defendants' brief, ''near the surface'' movement from the ponds to the plaintiffs' land cannot take place because of the numerous streets and roads, the state highway, railroad tracks, and structures of various kinds in the intervening area, which would constitute impassable barriers to such near-the-surface movement. Furthermore, there is evidence that certain areas of the plaintiffs' land which would probably be affected by such permeation, if it existed, were dry during the summertime. The only areas which, according to the testimony of Clubb, remained wet during the dry season were the area affected by water flowing from the west borrow pit and that adjacent to the state highway ditch. But there are many acres in addition which plaintiffs claim have been damaged and which it is reasonable to suppose would be equally affected if there were underground seepage resulting in saturation of the land.

The evidence above referred to would support a finding that water percolating through the ground beneath the level of the impervious clay would never come to the surface and that, due to obstructions, water could not move underground close to the surface from defendants' ponds to plaintiffs' land.

The entire question of saturation, in our opinion, was one of fact to be determined upon conflicting evidence, and the trial court's finding against the plaintiffs on that issue is conclusive in this court.

In recent years the city of Eugene and its environs have experienced a marked increase in population. New homes and new industries, most of them supplied with city water, are spread over the affected area. This entire territory is a watershed for the city. There

are no sewers in it, and the drainage here cannot be taken care of by the city sewer system for the movement of water is in the opposite direction. It is a reasonable inference, at least, that due to these conditions the quantity of surface water moving from the east toward the plaintiffs' land has greatly increased. The new highway through this district was built in 1938 or 1939, shortly before the construction of the Plywood pond.

There is evidence that the soil at the site of the borrow pits is open and porous with no hard clay underneath; that the elevation there is below that of the Willamette River, a mile or so distant; and that surface waters from the surrounding area percolate into the pits. There is also evidence of almost innumerable sources of surface waters draining into the ditch which empties into the east borrow pit.

The plaintiffs start out with the proposition that the damage to their land from year-round water did not manifest itself until after the defendants' log ponds were built. Of course, *post hoc ergo propter hoc* will not suffice to prove their case, and we do not understand that they so contend. They do point to certain facts in evidence on the basis of which, at most, an inference could be drawn that water leaking from the ponds reaches their land.

Upon a consideration of all the evidence the Circuit Court concluded in its finding of fact No. VIII that over a period of forty years, due to the construction of three railroad lines and a through state highway, drainage from the north portion of Eugene has converged at the overhead crossing and

> "thence under the Highway and through another small ornamental lake constructed by the Highway Department, and thence down through an ancient

waterway across the lands of the plaintiffs, and that any water crossing the lands of the plaintiffs is the result of innumerable sources of drainage entering waterways which have passed over plaintiffs' lands for half a century, and that the impounded water in defendants' ponds has not contributed to the waters flowing across plaintiffs' lands.''

The Circuit Court further found in finding No. IX that

''any water reaching the lands of the plaintiffs hereinbefore described, is the result of long continued conditions through ancient waterways and is due to some extent to the growth of the city of Eugene and surrounding territory and is not attributable in any respect to the log ponds of the defendants.''

 The proposition which the plaintiffs must sustain in this court, if they are to prevail, is that there is no evidence to support these findings; that the proof indeed establishes the defendants' liability as a matter of law. Judge Skipworth, who tried the case below and who is acknowledged to be one of Oregon's ablest judges, was of the opinion that, so far from that being true, the plaintiffs have failed even to carry the burden of proof resting upon them. It is no part of our duty to determine whether he was right in that conclusion. It is sufficient for us to say that he had the authority to reach it because there is substantial evidence to support it. We are without authority, therefore, to disturb the Circuit Court's findings.

It results that the judgment must be and it is hereby affirmed.